517 P.2d 1238

**STATE of Arizona, Appellee,**

v.

**Willie James CLARK, Appellant.**

**No. 2616.**

Supreme Court of Arizona,
In Banc.

Jan. 16, 1974.

Gary K. Nelson, Atty. Gen., Peter Van Crman, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. ·Lee, Maricopa County Public Defender, Rudy Gerber, Special Deputy Public Defender, Phoenix, for appellant.

LOCKWOOD, Justice:

The defendant, Willie James Clark, appeals from a conviction of second degree murder rendered in the Maricopa County Superior Court and from the imposition of

a sentence of not less than twenty-five nor more than thirty years in the Arizona State Prison.

On January 21, 1972, at 1:20 p. m., the defendant was stopped while driving a pickup truck along the Black Canyon Freeway by Phoenix police officers after he ran two red lights. After an initial investigation, he was charged at the scene with drunken driving and brought in to the police station. He was given a "Breathalizer Test". The result of the test showed that the defendant had a .24 per cent alcohol content in his blood.

While at the scene of the arrest the defendant had been asked to produce identification. In response to the request he produced a driver's license belonging to one Tim Blevins. The officers also discovered from a driveway sticker on the truck that it had been purchased the previous day by the same Tim Blevins. In a subsequent investigation later that day the officers went to the residence of Blevins and entered his unlocked apartment but found no one there. Suspecting foul play the officers returned to Blevins' apartment the following morning. This time the police discovered the body of Blevins underneath a pile of bedclothes. An examination of the corpse revealed that the body had been stabbed between 55 and 65 times.

After the discovery of the body, the investigation began to focus on the defendant as the possible killer. From the time of his arrest on January 21, 1972 and throughout the day, the defendant denied any involvement of any sort with the victim. On the following day after he had been advised of his rights, the defendant admitted that he had associated with the victim prior to his death. According to his testimony given in court, the defendant met Blevins in a bar and continued to drink with the victim in numerous locations around Phoenix. Later they went to the victim's apartment where the defendant was coerced into homosexual relations with the victim.

The next morning the defendant and the victim got into a fight. After the victim struck the defendant first, he struck back. He testified that he left the victim alive and sitting on the couch in the living room. After the defendant left, he took the victim's truck.

At his trial the defendant admitted he had a fight with the victim but denied that he killed him or remembered any details of the struggle. The defense introduced testimony to the effect that the defendant was probably unaware of his actions at the time of the fight because of a mental frenzy induced by having been coerced into having homosexual relations with the victim the previous evening. The prosecution introduced psychiatric testimony in rebuttal. After hearing all the evidence the jury found the defendant guilty of second degree murder.

In his appeal defendant contends that his severe intoxication which resulted in a .24 reading on the "Breathalizer Test" coupled with manifestations of possible severe head injuries may have rendered him incapable of understanding the statements he offered in response to police interrogation. Therefore the statements he made to police while in custody were involuntary and it was error to have admitted them into evidence.

The record reveals that there were a total of five meetings between the defendant and the police. In each case the defendant was completely advised of his rights by the officers involved. No promises, threats, force, or coercion was used to elicit any statements from the defendant.

The first two encounters occurred prior to the discovery by the police that a homicide had been committed. At the time of the first two encounters the police were focusing their investigation upon the victim for only the drunken driving violation.

With regard to the next three encounters with the police which occurred the following day, it can safely be assumed that the defendant was no longer under the influence of alcohol inasmuch as he spent the previous night in custody. Thus the

only statements which could be considered tainted would have to have been those made during the first two encounters with the police on the day of the defendant's arrest.

■ We stated the general rule concerning confessions made voluntarily by a person who is intoxicated in State v. Clark, 102 Ariz. 550, 434 P.2d 636 (1967). That rule is as follows:

"* * * proof that the accused was intoxicated at the time he confessed his guilt will not, without more, prevent the admissibility of his confession * * *. However, if it is shown that the accused was intoxicated to such extent that he was unable to understand the meaning of his statements, then the confession is inadmissible." 102 Ariz. at 553, 434 P.2d at 639.

■ In the case before us the fact situation is remarkably similar to that in State v. Clark, supra. In both cases the defendant did not make a confession but made exculpatory statements. Nevertheless the same rules would apply.

In Clark, supra, we held that even though the results of the "Breathalizer Test" indicated that the defendant had a .38 per cent alcoholic content in his blood, the record indicated that he still had sufficient mental capacity to understand what he was saying. In the instant case the defendant had a .24 per cent alcoholic content in his blood. Yet the defendant was able to manufacture an explanation for having a truck which he did not own. The arresting officer who had extensive experience dealing with drunk drivers testified that in his opinion the defendant was able to understand his rights as they had been explained to him notwithstanding the fact that he was intoxicated at the time. For these reasons we find that the defendant was able to know what he was doing when he made the exculpatory statements to the police. Thus we can find no error in admitting the defendant's statements to the police into evidence.

■ Defendant's next designation of error is that the prosecutor invited the jury to speculate unduly and prejudicially on the possibility that a successful insanity verdict would preclude any imprisonment for the defendant. Specifically the defendant objects to the prosecutor's questions which were asked at the conclusion of psychiatric testimony by Dr. Bendheim. His testimony was to the effect that the defendant may have been temporarily insane at the time of the killing. At that point the prosecuting attorney asked if the doctor knew "what would be done with this defendant should he be found not guilty by reason of insanity?" The immediate objection by defense counsel to the question was sustained. In addition the jury was instructed that where an objection has been sustained during the trial, the jury should not guess what the answer may have been or attempt to draw any inference from it. Also the jury was to disregard any comments which were not based upon the evidence. Finally although the question was improper, the question was never answered. Under these circumstances the prosecutor's question was harmless beyond a reasonable doubt and there was no error. State v. Branch, 108 Ariz. 351, 498 P.2d 218 (1972). See State v. Puffer, 110 Ariz. 180, 516 P.2d 316 (1973).

■ Defendant's final contention is that it was error to permit the introduction of numerous gruesome photographs of the victim. He urges that the photographs had no probative value and they merely inflamed the jury against the defendant. We have held on numerous occasions that the admission of this type of exhibit is within the sound discretion of the trial court. The lower court's ruling will be sustained on appeal unless it is apparent that there has been an abuse of discretion. State v. Williams, 107 Ariz. 262, 485 P.2d 832 (1971); State v. Brady, 105 Ariz. 190, 461 P.2d 488 (1969); State v. Chambers, 102 Ariz. 234, 428 P.2d 91 (1967); State v. Goodyear, 98 Ariz. 304, 404 P.2d 397 (1965).

The photographs were of definite probative value in that they depicted the position and condition of the deceased and the surroundings in his apartment where he was discovered. The photographs assisted the jury in understanding some of the circumstances of the crime which were otherwise only described in oral testimony. The photographs were important to show that the victim may have tried to defend himself. Finally the photographs tended to prove the defendant's theory that he was in a state of rage, furor, and panic at the time of the attack which would show that the defendant was temporarily insane when he killed the victim. Thus there was nothing in the evidence to show that the photographs which were admitted without objection were lacking in probative value or that they tended to inflame the jury.

Judgment affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER and HOLOHAN, JJ., concur.