IN THE COURT OF APPEALS

FILED BY CLERK

FEB 12 2010

COURT OF APPEALS
DIVISION TWO

THE STATE OF ARIZONA,       )
                            )    2 CA-CR 2009-0254
            Appellant,      )    DEPARTMENT B
                            )
        v.                  )    O P I N I O N
                            )
RYAN RAY OLM,               )
                            )
            Appellee.       )
                            )

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. CR-20084706

Honorable Richard S. Fields, Judge

AFFIRMED

Barbara LaWall, Pima County Attorney
  By Jacob R. Lines                                        Tucson
                                          Attorneys for Appellant

Karp & Weiss, P.C.
  By Stephen M. Weiss                                      Tucson
                                           Attorneys for Appellee

B R A M M E R, Judge.

¶1          The state appeals the trial court's grant of Ryan Ray Olm's motion to suppress evidence obtained in a warrantless search of his vehicle. The state argues Olm

had no protected privacy interest in the front yard of his home where the vehicle had been parked. Finding no error, we affirm.

## Factual and Procedural Background

¶2        In reviewing the denial of a motion to suppress evidence, we consider only the evidence presented at the suppression hearing, *State v. Blackmore*, 186 Ariz. 630, 631, 925 P.2d 1347, 1348 (1996), and view that evidence in the light most favorable to upholding the trial court's ruling. *State v. Rodriguez*, 205 Ariz. 392, ¶ 34, 71 P.3d 919, 929 (App. 2003). So viewed, a Tucson Police Department (TPD) officer, acting pursuant to instructions given him by TPD detectives, went to Olm's residence to "check the VIN [vehicle identification number] plate" of a black Mustang that previously had been seen there. When the officer arrived, Olm's black Mustang was parked in the residence's yard, to the left of a concrete walkway leading to the front door of the house from a public sidewalk adjacent to the public street. The Mustang was parked facing the residence, and the front end of the car was "about five or six feet" from the house. Olm testified he always parked his car in this fashion "[s]o nobody tampers with it."

¶3        The officer walked onto the yard, approximately ten to fifteen feet away from the concrete walkway, to the left side of the Mustang. He looked at the VIN plate through the Mustang's front windshield, and saw that the plate was slightly bent. The officer then went to the front door of the house and "tried to make contact with the residents." When no one responded, the officer contacted one of the detectives and reported the bent VIN plate on the Mustang. The detective then told the officer to seize

2

the Mustang, and the Mustang was soon towed to an impound lot. After searching the Mustang while it was at the impound lot, and after acquiring from Olm the key to its ignition, a detective drove it to an automobile dealership for further inspection "to identify specifically what parts were nonstandard Mustang parts that were on the vehicle."

¶4        A grand jury charged Olm with theft by control of a vehicle, in violation of A.R.S. § 13-1802(A)(5), and "conducting a chop shop," in violation of A.R.S. § 13-4702(A)(5), by buying, selling, or possessing a vehicle with a "removed, destroyed, defaced, or otherwise altered" VIN. Olm filed a motion to suppress all the evidence discovered during and as a result of the inspection and search of the Mustang. After an evidentiary hearing, the trial court, in granting Olm's motion, determined the yard was part of the curtilage of Olm's residence and the officer had therefore conducted a warrantless search by "walking onto [Olm]'s private property for the purpose of viewing the VIN plate." The court granted the state's motion to dismiss the charges without prejudice, and this appeal followed. *See* A.R.S. § 13-4032(6).

## Discussion

¶5        The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "Unlawful entry of homes was the chief evil which the Fourth Amendment was designed to prevent." *State v. Ault*, 150 Ariz. 459, 463, 724 P.2d 545, 549 (1986). That protection extends in general to "the 'curtilage,' the land immediately surrounding and associated

3

with the home." *Oliver v. United States*, 466 U.S. 170, 180 (1984). The test is whether the dwelling's resident has a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *see also Katz v. United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring). Warrantless searches, like the one here, are presumptively invalid, and the state bears the burden of proving their constitutionality. Ariz. R. Crim. P. 16.2(b); *Rodriguez v. Arellano*, 194 Ariz. 211, ¶¶ 9-10, 979 P.2d 539, 542 (App. 1999). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

¶6        The state argues Olm had no reasonable expectation of privacy in his front yard and that the yard was not part of the home's curtilage. Although the state presents these concepts as two distinct issues, they are closely interrelated. If the yard was not part of the curtilage of Olm's house, he had no reasonable expectation of privacy in the area where the Mustang had been parked. And, as we will explain, if the yard was part of the curtilage, the pertinent question is whether the officer viewed the Mustang's VIN plate from a legal vantage point. Before we reach those questions, however, we must first determine the proper standard of review.

¶7        In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court with respect to the factual determinations it made but review the court's legal conclusions de novo. *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118, 927 P.2d 776, 778 (1996). The state asserts the determination whether Olm had a reasonable expectation of

4

privacy in the yard and whether the yard was included in the curtilage of his home are legal conclusions and therefore subject to our de novo review. Olm responds that, because those determinations are largely factual, we instead review for clear error. As Division One of this court stated in *State v. Allen*, 216 Ariz. 320, ¶ 15, 166 P.3d 111, 115 (App. 2007), "[w]hether a particular expectation of privacy is recognized by society as objectively reasonable is a matter of constitutional law that we consider de novo." Thus, we review de novo whether Olm had a reasonable expectation of privacy.

¶8        As to the determination of the extent of the curtilage, the majority of courts we have surveyed view this also as a legal conclusion subject to de novo review. *See, e.g.*, *United States v. Davis*, 530 F.3d 1069, 1077 (9th Cir. 2008); *United States v. Brown*, 510 F.3d 57, 64 (1st Cir. 2007); *United States v. Cousins*, 455 F.3d 1116, 1121 (10th Cir. 2006); *United States v. Breza*, 308 F.3d 430, 435 (4th Cir. 2002); *State v. Fisher*, 154 P.3d 455, 468 (Kan. 2007); *State v. Martwick*, 604 N.W.2d 552, 558 (Wis. 2000); *but see United States v. Benish*, 5 F.3d 20, 23-24 (3rd Cir. 1993) (reviewing for clear error). Indeed, in *United States v. Johnson*, 256 F.3d 895, 909 n.1 (9th Cir. 2001), the Ninth Circuit Court of Appeals reversed its earlier decisions holding that curtilage issues were solely factual and concluded, based on the United States Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690 (1996), that such determinations are reviewed de novo.

¶9        The Supreme Court in *Ornelas*, when considering determinations of probable cause and reasonable suspicion, stated that review must be de novo because "the

legal rules for [such determinations] acquire content only through application" and therefore "[i]ndependent review is . . . necessary if appellate courts are to maintain control of, and to clarify, the legal principles." 517 U.S. at 697. The Court also noted "*de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined 'set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.'" *Id.* at 697-98, *quoting New York v. Belton*, 453 U.S. 454, 458 (1981). In *Johnson*, the Ninth Circuit determined those considerations "apply with equal force to the determination of where the curtilage ends" and "there is no conceptual difference between calling an area 'curtilage' and telling an officer he had 'probable cause' or 'reasonable suspicion.'" 256 F.3d at 912. We agree with this analysis and conclude we must review de novo a trial court's determination whether an area falls within a residence's curtilage.

¶10 The state argues the front yard where the Mustang was parked was not part of the curtilage of Olm's house and thus he had no privacy interest in that area. *See Oliver*, 466 U.S. at 180. In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court identified four factors relevant to determining whether an area is part of a home's curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." In discussing these factors, we are mindful they are

6

not to be "mechanically applied," and are merely "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration— whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* And, we emphasize that it is the state's burden to demonstrate the search was constitutionally sound. *See* Ariz. R. Crim. P. 16.2(b); *Rodriguez*, 194 Ariz. 211, ¶¶ 9-10, 979 P.2d at 542.

¶11    Here, the yard was not enclosed and Olm took no steps to protect it from observation. But the portion of the yard where Olm parked his Mustang directly abutted the home's front patio. And, despite the state's assertion to the contrary, there was no evidence the yard was regularly traversed by members of the public in order to "walk[] to the front door." Indeed, the evidence demonstrates the area was used as a parking area for Olm's private vehicle, for the express purpose of protecting it from the public. There was no evidence visitors to Olm's house used the front yard for parking or any other purpose.

¶12    Moreover, as the Supreme Court noted in *Dunn*, "'for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience.'" 480 U.S. at 302, *quoting Oliver*, 466 U.S. at 182 n.12. Olm's relatively small yard was bordered by clearly public sidewalks, thus marking the boundaries of the curtilage. And, given the presence of those sidewalks, no reasonable member of the public would be led to believe he or she was

7

permitted to cross the yard, instead of using those sidewalks. Further, a concrete walkway led directly from the public sidewalk, through the front yard, to the front door of Olm's house. Taken together, these facts clearly indicate the yard is "intimately tied to the home itself [such] that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301; *see also United States v. Hedrick*, 922 F.2d 396, 399 (7th Cir. 1991) ("[T]he yard of a residential home is within the curtilage of the house.").

¶13 That the yard was within the house's curtilage does not end our inquiry. Residents generally do not have a legitimate expectation of privacy in a path across their driveway to and including their front porch and front door, because that area is implicitly open to the public, thereby "necessarily negat[ing] any reasonable expectancy of privacy in regard to observations made there." *Lorenzana v. Superior Court*, 511 P.2d 33, 35 (Cal. 1973); *see State v. Kosman*, 181 Ariz. 487, 490, 892 P.2d 207, 210 (App. 1995) ("Defendant had no reasonable expectation of privacy in the area outside his door because the area is a public place where anyone, including the police, had a right to be."). Therefore, no Fourth Amendment violation occurs when an officer, without a warrant, crosses the curtilage to knock on the front door to ask questions of the resident. *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001). Nor are the occupant's Fourth Amendment rights violated when the officer observes contraband in plain sight from a lawful vantage point. *See, e.g.*, *United States v. Hersh*, 464 F.2d 228, 230 (9th Cir. 1972) (affirming admissibility of contraband seen by officers standing on front porch who knocked, received no answer, then peered into window beside front door); *United States*

*v. Taylor*, 90 F.3d 903, 906-09 (4th Cir. 1996) (no search when officers, standing on front porch after contacting occupant, observed contraband through open window eight feet from front door); *People v. Holmes*, 981 P.2d 168, 171 (Colo. 1999) (no search when police, standing on front porch, observed contraband through open front door).

¶14      It is undisputed that the officer could not see the Mustang's VIN plate from the street, the sidewalk, the concrete walkway leading to the front door, or from the area by the front door.  In order to see the VIN plate, the officer had to enter the yard.  The state argues that, because the yard was actually used as a driveway, it is a semiprivate area the officer could enter without invitation or justification.  *See State v. Cobb*, 115 Ariz. 484, 489, 566 P.2d 285, 290 (1977) (driveway generally considered "semiprivate" and resident's privacy expectation for "activities on his driveway will generally depend on the nature of the activities and the degree of visibility from the street"); *State v. Dugan*, 113 Ariz. 354, 356 n.1, 555 P.2d 108, 110 n.1 (1976) ("[I]n most instances a person does not have a reasonable expectation of privacy as to a non-intrusive viewing of items in his driveway.").

¶15      We disagree.  The concrete walkway clearly delineated the path guests were expected to take from the street or sidewalk to Olm's front door.  It was not necessary for the officer, or any member of the public, to leave the walkway in order to reach Olm's front door.  And, as we explained above, no reasonable member of the public would believe he or she had permission to enter the yard to peer into the vehicle. The mere fact that Olm parked his private vehicle in his yard, thus arguably converting

9

that area to a semiprivate area, does not compel a different conclusion. Driveways are considered semiprivate areas not because members of the public reasonably could enter them without explicit permission, but because the activities and items in a driveway generally are more readily observable. *See Dugan*, 113 Ariz. at 356 n.1, 555 P.2d at 110 n.1. Unlike the situation in *Cobb*, where the officer observed a possibly stolen broach lying in plain view on the ground, 115 Ariz. at 487, 566 P.2d at 288, the officer here first had to leave the walkway, enter the yard, and peer through the vehicle's windshield to see the VIN plate on the dashboard.

¶16 The state also contends Olm had no reasonable expectation of privacy in the yard because it was not enclosed. But the state cites no authority, and we find none, suggesting that merely because a private residential yard is unenclosed, law enforcement officers are thereby permitted to enter that yard to conduct a warrantless search absent an exception to the warrant requirement not present here. The cases upon which the state relies are readily distinguishable. *See State v. Platt*, 130 Ariz. 570, 573, 637 P.2d 1073, 1076 (App. 1981) (no reasonable expectation of privacy concerning observations made from neighbor's yard); *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (officer could enter shared yard of duplex when no evidence plaintiffs "could exclude others from the yard"); *United States v. Titemore*, 437 F.3d 251, 259 (2nd Cir. 2006) (observations made by officer after approaching primary entryway). It is undisputed the officer could not see the Mustang's VIN plate without entering Olm's yard, made no

10

attempt to contact anyone in the home until after crossing the yard and viewing the VIN plate, and easily could have reached the front door using the concrete walkway.

**¶17** Accordingly, we conclude the front yard area where Olm's Mustang was parked was part of his house's curtilage, and that, by entering the yard, the officer was not in a lawful viewing position when he saw the Mustang's VIN plate. His doing so was a prohibited warrantless search. The trial court therefore did not err in granting Olm's motion to suppress evidence.

## Disposition

**¶18** We affirm the trial court's grant of Olm's motion to suppress evidence.

_____
J. WILLIAM BRAMMER, JR, Judge

CONCURRING:


_____
PETER J. ECKERSTROM, Presiding Judge


_____
GARYE L. VÁSQUEZ, Judge

11